**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONNA M. ELMS,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **PRUDENTIAL INSURANCE** | : | |
| **COMPANY OF AMERICA,** | : | |
| Defendant | : | **No. 06-5127** |

**M E M O R A N D U M**

PRATTER, J.                                                          OCTOBER 2, 2008

Presently before the Court are cross motions for summary judgment filed by plaintiff

Donna M. Elms and defendant Prudential Insurance Company of America ("Prudential"),

respectively, relating to Prudential's termination of Ms. Elm's long-term disability ("LTD")

benefits.  This action arises under Section 502(a)(1)(B) of the Employee Retirement Income

Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").   The cross motions have been fully

briefed, and the Court presided over oral arguments.  For the reasons discussed below, Ms.

Elms's motion for summary judgment will be granted, and Prudential's motion will be denied.

**JURISDICTION**

The Court has jurisdiction under 28 U.S.C. § 1331 and pursuant to ERISA, § 1132(e)(1).

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are undisputed unless otherwise noted.

Ms. Elms, 43, was employed as a Human Resources Assistant[1] at Diebold, Inc. when she

_____

[1] Although there was some confusion as to whether Ms. Elms was employed as a "Senior
Secretary" or a "Human Resources Assistant" (which will be more fully discussed infra),
Prudential admits that "plaintiff was employed as a Human Resources Assistant prior to being
involved in a motor vehicle accident on January 31, 2001."  (Def.'s Resp. to Pl.'s Mot. SJ ¶ 2.)

1

was involved in a non-work-related motor-vehicle accident on January 31, 2001.  (R. at PRU 000271, 274-279, 321.)[2]  Immediately after the accident, she consulted with a chiropractor, Dr. Dean DePice, who diagnosed her with an "[a]cute moderate cervical sprain/strain resulting in cervical neuritis."  Dr. DePice advised her to stop working until February 9, 2001.  (R. at PRU 000321-323.)  On February 12, 2001, Ms. Elms went back to work on light duty pursuant to Dr. DePice's recommendation.  (R. at PRU 341.)

In June of 2001, Ms. Elms began treatment with a different chiropractor, Dr. Marc Shragher, who referred her for an MRI of the cervical and lumbar spine. (R. at PRU 000317-318.)  The MRI revealed minimal disc bulging at C5-6 and C6-7, and mild bulging of the L4-5 disc.  (R. at PRU 000317-318.)  This result indicated no change from a previous MRI performed on March 3, 2000.  (R. at PRU 000317-318).

On December 28, 2001, Dr. Shragher diagnosed Ms. Elms as suffering from lumbar and cervical disc protrusion, cervical, thoracic and lumbar sprain/strain, cervical and lumbar radiculitis, brachial plexus injury and lumbosacral plexus traction injury.  (R. at PRU 000337-340.)

Dr. Shrager referred Ms. Elms to Dr. Ferhan Beken, a neurologist.  On June 20, 2001, after examining Ms. Elms, Dr. Beken concluded that Ms. Elms had a brachial plexus injury and possible lower extremity nerve damage.  Dr. Beken advised Ms. Elms to stop working immediately.  (R. at PRU 000243-248, 334.)

---

[2] The administrative record in this case is bates-numbered using the prefix "PRU," followed by a six-digit page number.  For example, the citation "R. at PRU 000001" refers to page 1 of the administrative record.  The Court's citations to the administrative record follow that format throughout this Memorandum.

Ms. Elms ceased working on June 29, 2001, six months after the motor vehicle accident which caused her injuries (R. at PRU 000274).  Thereafter, she filed a claim for LTD benefits under Group Contract G-23864 ("Policy") issued by Prudential to Diebold.  (R. at PRU 000001-45, 271-272.)  This Policy is an employer sponsored benefit program and, as such, is subject to the terms of ERISA.  (R. at PRU 000008.)

The Policy provides that:

"Total Disability" exists when Prudential determines that all of these conditions are met:

1. Due to Sickness or accidental injury, both of these are true:
   (a) You are not able to perform, for wage or profit the material and substantial duties of your occupation.
   (b) After the Initial Duration[3] of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training, or experience.
2. You are not working at any job for wage or profit.
3. You are under the regular care of a Doctor.

(R. at PRU 000012.)

On December 27, 2001, Dr. Beken completed an "Attending Physician's Statement" that was submitted to Prudential, in which he indicated that Ms. Elms had developed brachial plexus and lumbosacral plexus injury as a result of the motor vehicle accident.  He opined that she was unable to work because she could not use her arm, sit, or walk.  (R. at PRU 000269-270.)  At the time he rendered this opinion, Dr. Beken had been treating Ms. Elms for six months, seeing her approximately once every two weeks.

In a report, also dated December 27, 2001, Dr. Beken stated that Ms. Elms's "brachial

---

[3] The "Initial Duration" under the Policy is equal to 60 months.

3

plexus injury and RSD [Reflex Sympathetic Dystrophy Syndrome]"[4] were stable at that point. (R. at PRU 000301.)

The record also contained reference to Dr. Michael J. Gratch, an orthopedist.[5]  Dr. Gratch noted a normal orthopedic examination and stated that Ms. Elms had a sprain of the lumbosacral spine, and some disc bulging on her MRI, but no herniations.  Dr. Gratch did not "have an answer" for her pain or discomfort and stated that "time is her only friend, unfortunately."  (R. at PRU 000335-336.)  He recommended that she work on her exercises and rehabilitation program.  (R. at PRU 000336.)

---

[4] "Reflex Sympathetic Dystrophy Syndrome," or RSD, is defined as follows:
> A group of symptoms that sometimes follow an injury to an upper or lower limb. The symptoms include unduly prolonged or intense pain that persists long after the injury has healed, skin redness, delay in recovering the function of the limb, and changes in the bone and skin suggestive of an interruption in the nerve supply or nutritional blood supply.

Attorneys' Dictionary of Medicine 1346 (2005).  According to the Reflex Sympathetic Dystrophy Syndrome Association, RSD, which is also known as Complex Regional Pain Syndrome Type I ("CRPS"), is a chronic neurological syndrome characterized by severe burning pain, pathological changes in bone and skin, excessive sweating, tissue swelling, and extreme sensitivity to touch.  See Reflex Sympathetic Dystrophy Syndrome Association, "What is CRPS?", available at http://www.rsds.org/2/what_is_rsd_crps/index.html (last visited October 1, 2008).

As discussed below, in their briefs and during oral argument on the cross motions for summary judgment, Prudential emphasized Dr. Beken's early diagnosis of Ms. Elms's RSD, and questions whether Ms. Elms actually had RSD or CRPS.  The Court's review of the record indicates that Dr. Beken's December 27, 2001 report is the first mention of RSD in the record. (R. at PRU 000301.)  However, in Dr. Beken's April 26, 2002 narrative he notes that Ms. Elms exhibited initial signs of CRPS on October 11, 2001.  (R. at PRU 000246.)  Dr. Beken stated that following Ms. Elms's November 2, 2001 appointment, "I was sure she was developing Complex Regional Pain Syndrome at this time."  (R. at PRU 000246.)  Dr. Beken noted that "[Ms. Elms] continued to show signs of RSD, otherwise known as Complex Pain Syndrome" at her December 27, 2001 appointment.  (R. at PRU 000247.)

[5] Dr. Beken's April 26, 2002 narrative referred to an orthopedic surgeon, Dr. Perlson, who informed Ms. Elms that she did not have any orthopedic conditions and/or thoracic outlet syndrome.  (R. at PRU 000244.)

4

On March 25, 2002, Prudential first determined that Ms. Elms was not eligible to receive LTD benefits.  (R. at PRU 000257-259.)  Prudential's letter to Ms. Elms notifying her of its decision did not contain a description of Ms. Elms's job-related duties.  Nevertheless, Prudential noted that Ms. Elms's job position, which it incorrectly identified as "Senior Secretary," was "predominantly sedentary in nature."  (R. at PRU 000258.)  Based on Prudential's examination of medical records from Dr. Beken, Dr. Gratch, and the Achievement Center at Warminster Hospital, Prudential determined that "there [was] no medical documentation of an impairment which would prevent you from performing the sedentary duties of your occupation."  (R. at PRU 000258.)  Prudential also stated, "[i]t is important to mention there is no supportive medical data to support your Reflex Sympathetic Dystrophy condition."  (R. at PRU 000258.)

On June 12, 2002, Ms. Elms appealed Prudential's decision denying her LTD benefits. (R. at PRU 000217-219.)  According to Ms. Elms, her main problem was not bulging discs but was nerve damage.  (R. at PRU 000217.)  Ms. Elms also stated that her job, which was not a Senior Secretary but was a Human Resources Assistant, was not sedentary and that it required frequent lifting, walking and traveling, all of which she claimed she was unable to do.  (R. at PRU 000218.)

In support of her appeal, Ms. Elms provided evidence that she had been awarded benefits by the Social Security Administration beginning July 2, 2001 (R. at PRU 000249-252), and she also provided a narrative report from Dr. Beken dated April 26, 2002.  (R. at PRU 000243-248 .) Dr. Beken's report stated that Ms. Elms's condition of cervical and lumbar disc bulging and brachial and lumbar-sacral plexus traction injury had "progressed to RSD."  (R. at PRU 000247.) Dr. Beken stated the following:

> I don't see much hope for her to recover from this condition.  After about a year of treatment I think her condition became chronic.  Unfortunately, I have not seen any case of RSD reversing after this stage.  I think she will have to learn to live with this pain and disability at [this] point.

(R. at PRU 000247.)  Dr. Beken recommended that Ms. Elms remain out of work, and that her "pain, hyperalgesia of the skin, inability to move her left arm and diminished movement of the leg with pain are going to be part of her life and she will not be able to work, drive or do her housework."  (R. at PRU 000248.)

To aid Prudential's review, Diebold submitted a statement describing the "Human Resources Assistant" position, which indicated that Ms. Elms's job required sitting most of the day, using a computer, and numerous other administrative responsibilities.  (R. at PRU 000278-279.)

On October 7, 2002, after completing its review, Prudential found that while Ms. Elms was treated for five months following the motor vehicle accident for largely musculoskeletal complaints, it appeared that her condition had advanced to a more neurological condition documented to be brachial plexus traction injuries and RSD.  (R. at PRU 000348-349.)  Based on the additional records produced, Prudential found that an impairment appeared to have existed during the entire Elimination Period and granted Ms. Elms benefits up to the date of Dr. Beken's report, i.e., April 26, 2002.  (R. at PRU 000214-215, 000350.)[6]

_____

[6] Prudential's letter to Ms. Elms did not state or explain to Ms. Elms its reasons for reversing its prior determination.  It merely noted that her claim would be reinstated, and that Prudential would continue to obtain records from Ms. Elms's attending physicians to support her continued eligibility for benefits.  (R. at PRU 000214-215.)

However, Prudential's internal notes indicate that it reversed its prior position based on Dr. Beken's diagnosis that Ms. Elms's condition had progressed to RSD.  (R. at PRU 000350.)  In addition, Prudential noted that Ms. Elms's current condition was "unknown."  (R. at PRU 000348.)  In its notes, Prudential indicated that it may consider requesting an Independent

At that time, Prudential requested that Ms. Elms undergo an independent medical evaluation, or "IME," which was conducted by Dr. James J. Gaul, a neurologist, on February 6, 2003.  Dr. Gaul examined Ms. Elms and found evidence of a brachial plexus traction injury of the left side, cervical strain, lumbar sacral strain, and evidence of spasm (which, he noted, may have contributed to her brachial plexus dysfunction).  (R. at PRU 000201-204.)  However, Dr. Gaul did not find any evidence of RSD at that point.  (R. at PRU 000203.)  Dr. Gaul concluded that "the degree of pain and spasm that [Ms. Elms] suffers does currently preclude her from any job as physically she is capable of at most what would generally be considered sedentary work, with postural freedom but the pain is likely to be distracting."  (R. at PRU 000204).  Dr. Gaul recommended that Ms. Elms seek additional treatment, including aggressive physical therapy and/or injections to treat her pain.  He stated that if Ms. Elms pursued the course of treatment he suggested, he "would expect her to be able to return to at least a sedentary/light duty position within three-six months."  (R. at PRU 000204.)  The administrative record does not contain records of any follow-up evaluation by Dr. Gaul.

Prudential then contacted Dr. Beken to see if he agreed with Dr. Gaul's suggested course of treatment.  (R. at PRU 000194, 197-198).  However, Dr. Beken found Dr. Gaul's suggestions unacceptable, noting that aggressive physical therapy and injections would aggravate Ms. Elms's RSD.  (R. at PRU 000188-190.)  In addition, Dr. Beken sent a letter to Prudential, dated November 10, 2003, in which he opined that Ms. Elms suffered from brachial plexus traction injury, lumbosacral plexus injury of the left side and mild RSD of the left-side extremities.  (R. at PRU 000188-189.)  He stated as follows:

---

Medical Evaluation ("IME") and/or file review with a neurologist.

7

Donna is experiencing chronic pain.  Her syndrome became chronic and she is now considered disabled.  I have not seen anyone who has recovered after so many years from this syndrome.  I recommended her to not pull, push, lift or carry.  Any of these types of activities would worsen her pain and syndrome.

Her nervous system is hyper sensitized.  Performing aggressive injections or physical therapy may further aggravate her RSD.

(R. at PRU 000189.)  In October 2003, based on Dr. Beken's evaluations, Prudential extended LTD benefits to Ms. Elms.[7]

On August 5, 2004 and October 15, 2004, Prudential requested the completion of additional documentation of Ms. Elms's continuing disability. (R. at PRU 000186-187.)  Ms. Elms did not comply with these requests.[8]

On January 13, 2005, Prudential sent a final reminder requesting her to complete the enclosed forms by no later than February 13, 2005.  (R. at PRU 00183-185.)  Prudential's letter stated that it would "deny [Ms. Elms's] claim or stop sending [her] payments if the appropriate information is not submitted."  (R. at PRU 00184.)

On February 17, 2005, after getting no response from Ms. Elms, Prudential terminated

---

[7] The record does not contain any written confirmation of benefits sent by Prudential to Ms. Elms during October 2003.  Prudential's internal notes, dated October 7, 2003, state that the available medical data showed "no significant improvement in her condition."  (R. at PRU 000354.)  However, Prudential also stated that it would follow up with Ms. Elms "periodically" for any changes in her condition.  (R. at PRU 000355.)

It is not clear from the record that Prudential actually informed Ms. Elms, at this juncture, that it intended to follow up with her periodically.  This may explain why Ms. Elms appeared to be uncooperative, as described below, when Prudential continued to ask for medical evidence of her "continuing disability."

[8] According to Prudential's notes of telephone conversations with Ms. Elms in August 2004, Ms. Elms did receive Prudential's requests but chose not to supply the information.  (R. at PRU 000382.)  It appears Ms. Elms may not have understood why Prudential sought further information about her condition.

8

her LTD benefits. (R. at PRU 000168-170.)  On or about February 21, 2005, Prudential received

an Attending Physician's Statement completed by Dr. Beken, as well as Ms. Elms's own

statement.  (R. at PRU 000167, 171-173, 178-181.)

On March 22, 2005, Ms. Elms confirmed that she was appealing Prudential's February

17, 2005 decision to terminate her benefits.  (R. at PRU 000166.).  Other than Dr. Beken's

Attending Physician's Statement, Ms. Elms did not supply any additional medical records in

support of her claim.  Prudential requested copies of her office visit notes from Dr. Beken.  (R. at

PRU 000151, 000358.)

In his Attending Physician's Statement, Dr. Beken opined that Ms. Elms suffered from

lumbar strains, lumbar plexus, traction injury, and "Causalgia," and states that she has "nerve

damage once convert [sic] to Causalgia."  (R. at PRU 000173.)[9]  He further states that Ms. Elms

cannot sit, stand, or walk for long periods of time, and cannot lift, pull, push or carry anything.

(R. at PRU 000173.)  In response to a question asking what job category "best describes [Ms.

Elms's] functional abilities," Dr. Beken rejected the options "sedentary" or "light" in favor of

"other."  (R. at PRU 000173.)

On or about May 5, 2005, Prudential had its medical director, Dr. Fallon, review Ms.

Elms's medical records.  (R. at PRU 000359.)  Dr. Fallon determined that based on Ms. Elm's

recent medical records her restrictions and limitations include lifting up to ten pounds

---

[9] "Causalgia" is defined as "[a] burning sensation or pain, especially in the palms and soles, caused by injury to the nerves which carry impulses from these parts. In some cases the skin undergoes deteriorative changes."  Attorneys' Dictionary of Medicine 2591 (2005). Causalgia is another term describing RSD, and is also defined as CRPS Type II, which describes cases of CRPS where a distinct "major" nerve injury has occurred.  See Reflex Sympathetic Dystrophy Syndrome Association, "What is CRPS?", available at http://www.rsds.org/2/what_is_rsd_crps/index.html (last visited October 1, 2008).

occasionally and no overhead activity or repetitive pushing or pulling.  (R. at PRU 000359.)[10]

Thereafter, Prudential conducted a review of Ms. Elms's job duties with Diebold.  (R. at PRU

000360).  A review of the written job description as well as telephone conversations with the

employer revealed that Ms. Elms's duties included, among other things, answering telephone

calls, providing support for presentations, making travel arrangements, word processing duties,

other computer work, mail preparation, and traveling occasionally (up to six times per year).  (R.

at PRU 000275-279, 361-362, 383, 387, 390-392.)

On June 27, 2005, Prudential upheld its decision to terminate Ms. Elms's LTD benefits.

(R. at PRU 000142-145.)  Based heavily on the conclusions reached by its own medical director,

Dr. Fallon, Prudential determined that Ms. Elms's restrictions and limitations included lifting up

to 10 pounds occasionally and no overhead activity or repetitive pushing or pulling.  (R. at PRU

000144.)  Prudential concluded that with these restrictions, she would functionally be able to

perform her occupation, which Prudential characterizes as "sedentary."  (R. at PRU 000144.)

Prudential found that Ms. Elms's only restriction appears to be her subjective reports of pain

which, it claims, does not, in and of itself, support a disability.  Prudential stated that its findings,

coupled with the lack of sufficient documentation of a sickness or injury preventing Ms. Elms's

return to work, substantiated its termination of her benefits.  (R. at PRU 000144.)

On December 20, 2005, Ms. Elms appealed Prudential's decision to terminate her LTD

benefits.  (R. at PRU 000133-139.)  Ms. Elms argued that her job duties were inaccurately

characterized, she was more active than reported, she continues to suffer from brachial plexus

---

[10] Although Dr. Fallon reviewed Dr. Beken's evaluation that Ms. Elms could not sit,
stand, or walk for extended periods of time, she apparently did not acknowledge, chose not to
believe, or chose not to "count" those limitations in her "conclusions."  (R. at PRU 000359.)

injuries and RSD, the IME was incorrect, and that she is not able to perform the material and substantial duties of her occupation. (R. at PRU 000134.) Ms. Elms did not submit any records with her letter of appeal.[11]

By May 1, 2006, Ms. Elms completed her appeal, submitting medical records from Dr. Beken (R. at PRU 000092-94), and Dr. Randy Robinson (R. at PRU 000095-115), which included her most recent MRI results.

Prudential forwarded the complete medical documentation in Ms. Elms' file to Dr. Joseph Jares, a neurologist, for a "file review." (R. at PRU 000087, 000079-86, 000366.) After a complete review of Ms. Elms's claim file, but without ever examining her in person, Dr. Jares found that Ms. Elms "remains functionally impaired as of February 18, 2005 forward." (R. at PRU 000084.). Dr. Jares found that a moderate functional impairment was supported by Ms. Elms's subjective complaints and her "consistently abnormal examinations," showing spasm and tenderness. (R. at PRU 000084.) Dr. Jares supported his conclusion by reference to records from examinations by Dr. Gaul, Dr. Beken, and Dr. Robinson. (R. at PRU 000084-85.) Moreover, Dr. Jeres concluded that Ms. Elms's functional impairments would restrict her physical activity. He determined that she could sit continuously but would require an allowance for repositioning every one hour; walking and standing would be restricted to an occasional basis up to two hours total, and no more than 20-30 minutes at a time; lifting and carrying would be

_____

[11] Ms. Elms did not complete her appeal within 180 days, as required by ERISA. However, Prudential gave Ms. Elms another 30 days to complete her appeal. (R. at PRU 000122.) Plaintiff's counsel then requested another 30 days and Prudential granted that request. (R. at PRU 000118-120.) Prudential further extended this deadline another 30 days to allow Ms. Elms to submit additional medical records. (R. at PRU 000117.) By May 1, 2006, plaintiff's submission of documentation in support of her appeal was complete. (R. at PRU 000090.)

restricted to up to 10 pounds on an occasional basis; reaching activities would be restricted to no more than 18 inches on an occasional basis; and gripping, grasping, pinching and performing repetitive and fine motor activities would be restricted to an occasional basis. (R. at PRU 000085.) Dr. Jeres stated that such limitations would be temporary and should be in place for the next 12 months, that further treatment by Drs. Beken and Robinson would be appropriate for at least one year, and that her prognosis with ongoing treatment is "fair." (R. at PRU 000085.)

On July 26, 2006, Prudential upheld its decision to terminate Ms. Elms's LTD benefits. (R. at PRU 000064-69.) Prudential cited to Dr. Jares's file review, and found that Dr. Jeres's conclusions were consistent with the findings of Dr. Fallon, Prudential's medical examiner, who also found similar restrictions and limitations. Prudential's letter essentially quoted Dr. Jeres's report verbatim, and then offered the following two-sentence conclusion: "Given the above restrictions and limitations, we have determined Ms. Elms would be functionally able to perform her own occupation. We have determined that our decision was appropriate and have upheld our decision to terminate her claim for LTD benefits." (R. at PRU 000069.)

Thereafter, Ms. Elms filed a Complaint in federal court seeking judicial review of Prudential's decision to terminate her LTD benefits.

During an initial pretrial conference before the Court, counsel for the parties noted their disagreement as to the appropriate standard of review in this case, and as to whether discovery was permitted and/or warranted. After receiving letter submissions from counsel regarding both of these issues, the Court decided to reserve its decision on the standard of review until the issue was fully briefed by the parties in their respective cross motions for summary judgment and response briefs. (See Docket No. 10.) However, the Court permitted the parties to conduct

limited discovery related to the following: (1) any potential "conflict of interest" arising from Prudential's dual role in funding benefits and resolving claims; (2) how Prudential calculated the amount of Ms. Elms's benefits; (3) the information Prudential relied upon in making its determinations regarding Ms. Elms's benefits; and (4) Ms. Elms's allegation that Prudential made its decision with respect to her claim based upon incomplete and inadequate information.

After the limited discovery period concluded, the parties filed cross motions for summary judgment. In its motion, Prudential argues that the Court should review this case applying the "arbitrary and capricious" standard, and in so doing, that the Court should uphold Prudential's decision to terminate Ms. Elms's benefits. In her motion, Ms. Elms's argues that the Court should review Prudential's decision <u>de novo</u>, and find that Prudential's decision is not supported by the evidence in the record, and that even if the "arbitrary and capricious" standard applies, Ms. Elms should still prevail on her motion.

As indicated above, the Court heard oral arguments on the parties' cross motions for summary judgment.

## LEGAL STANDARDS

### I. SUMMARY JUDGMENT STANDARD

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." <u>Miller v. Ind. Hosp.</u>, 843

F.2d 139, 143 (3d Cir. 1988).   An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if it could affect the result of the suit under governing law.  Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record.  Celotex, 477 U.S. at 322-23.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."  Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

On cross motions for summary judgment, the same standards and burdens apply.  See Applemans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987); Peters Twp. Sch. Dist. v. Hartford Accident and Indem. Co., 833 F.2d 32, 34 (3d Cir. 1987).  Cross motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waived judicial consideration and determination whether genuine issues of material face exist.

Transportes Ferreos de Venezuella II Ca v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968).  When presented with cross motions for summary judgment, the Court must consider the motions separately.  See Williams v. Phila. Hous. Auth., 834 F.Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994).

## II.    ERISA STANDARD

### A.    The Supreme Court's Firestone Ruling

Subparagraph 1132(a)(1)(B) of ERISA allows a plan beneficiary to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  ERISA does not specify the standard of review that a trial court should apply in an action for wrongful denial of benefits, but the Supreme Court has provided guidance.  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Id.  The de novo standard "applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest."  Id.

15

**B.    "Arbitrary and Capricious" Review and the <u>Pinto</u> and <u>Post</u> Decisions**

When a plan administrator has discretionary authority, the "arbitrary and capricious"

standard applies.  When applying the "arbitrary and capricious" standard,[12] a district court may

overturn a decision of a plan administrator or fiduciary "only if it is 'without reason, unsupported

by substantial evidence or erroneous as a matter of law.'"  <u>Abnathya v. Hoffmann-La Roche,</u>

<u>Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993) (quoting <u>Adamo v. Anchor Hocking Corp.</u>, 720 F. Supp. 491,

500 (W.D. Pa. 1989)).  This scope of review is <u>narrow</u>, and "'the court is not free to substitute its

own judgment for that of the defendants in determining eligibility for plan benefits.'" <u>Id.</u> (quoting

<u>Lucash v. Strick Corp.</u>, 602 F. Supp. 430, 434 (E.D. Pa. 1984)).  However, "if a benefit plan

gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that

conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"

<u>Firestone</u>, 489 U.S. at 115 (<u>quoting</u> Restatement (Second) of Trusts § 187, Comment d (1959)).

Most courts of appeals, including the Court of Appeals for the Third Circuit, adopted a

"sliding scale" standard of review in addressing conflicts of interest after <u>Firestone</u>. <u>See</u> <u>Post v.</u>

<u>Hartford Ins. Co.</u>, 501 F.3d 154, 161 (3d Cir. 2007).  This approach grants the administrator

deference in accordance with the level of conflict.  "Thus, if the level of conflict is slight, most of

the administrator's deference remains intact, and the court applies something similar to

traditional arbitrary and capricious review; conversely, if the level of conflict is high, then most

of its discretion is stripped away."  <u>Id.</u> (citing <u>Doe v. Group Hospitalization & Med. Servs.</u>, 3

---

[12] The "arbitrary and capricious" standard is essentially the same as an "abuse of discretion" standard.   <u>Abnathya v. Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 45 n.4 (3d Cir. 1993); <u>see</u> <u>also</u> <u>Nazay v. Miller</u>, 949 F.2d 1323, 1336 (3d Cir. 1991); <u>Daniels v. Anchor Hocking Corp.</u>, 758 F. Supp. 326, 328-30 (W.D. Pa. 1991).

F.3d 80, 87 (4th Cir. 1993)).[13]

In Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377, 392 (3d Cir. 2000), our court of appeals adopted the sliding scale approach, and in Post the court of appeals further elucidated its approach to "arbitrary and capricious" review, 501 F.3d at 161.  The Post court noted that under this approach, a district court "should examine benefit denials on their facts to determine whether the administrator abused its discretion." Post, 501 F.3d at 161 (citing Pinto, 214 F.3d at 391).

In so doing, the Court first must consider the evidence, if any, that the administrator acted from an improper motive, and heighten its level of scrutiny appropriately.  Id. at 162 (citing Pinto, 214 F.3d at 392).  Next, the Court will review the merits of the administrator's decision and the evidence of impropriety together to determine whether the administrator properly exercised the discretion accorded it.  Id. (citing Pinto, 214 F.3d at 394).  If the administrator did properly exercise its discretion, the administrator's decision stands; if not, the Court steps into the shoes of the administrator and rules on the merits itself.  Id.  The burden of proof is on the

---

[13] The Court recognizes that the Supreme Court's recent decision in Met. Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008) may alter the Third Circuit's sliding scale approach.  In Glenn, the Supreme Court clarifies that its language in Firestone directing that a conflict "be weighed as a 'factor in determining whether there is an abuse of discretion'" does not imply that identified conflicts change the standard of review, but rather that courts should weigh conflicts along with other considerations in deciding whether a plan administrator abused its discretion.  Id. at 2350-51.  Although some of the language in the Third Circuit's sliding scale cases discusses heightening the standard of review, the sliding scale is merely a tool the Third Circuit has employed to help district courts identify and weigh conflicts of interest, which is consistent with the Supreme Court's advice in Glenn.  Indeed, the Third Circuit has said that the sliding scale approach "reduces to making a common-sense decision based on the evidence whether the administrator appropriately exercised its discretion.  This theme, rather than getting bogged down in trying to find the perfect point on the sliding scale, should be district courts' touchstone." Post, 501 F.3d at 162.

claimant to show that a heightened standard of review is warranted in a particular case.  Schlegel
v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 617 (E.D. Pa. 2003).

In determining whether and how to heighten the "arbitrary and capricious" sliding scale,
the Court must consider both "structural" and "procedural" factors.  Post, 501 F.3d at 162 (citing
Pinto, 214 F.3d at 392-93).  "The structural inquiry focuses on the financial incentives created by
the way the plan is organized, whereas the procedural inquiry focuses on how the administrator
treated the particular claimant."  Id. (emphasis added).

1.  *Structural Factors*

The Third Circuit Court of Appeals has held that "a structural conflict arises when the
administrator has a non-trivial financial incentive to act against the interests of the beneficiaries."
Id. (citing Pinto, 214 F.3d at 389).  Such a conflict is, by itself, sufficient to heighten a court's
review.  Id. (citing Pinto, 214 F.3d at 390).  The Pinto court provided four non-exclusive
structural factors for courts to consider: (1) the sophistication of the parties, (2) the information
accessible to the beneficiary, (3) the financial arrangement between the employer and
administrator, and (4) the financial status of the administrator.  Pinto, 214 F.3d at 392.  The court
of appeals also considered the administrator's claim evaluation process, according more
deference to administrators that use an independent body to evaluate claims, which would lessen
the effect of any conflict).  Id. at 163 (citing Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d
250, 255 (3d Cir. 2004)).

The inquiry which lies at the heart of all of these factors is "whether the plan is set up so
that the administrator has strong financial incentives routinely to deny claims in close cases – in
short, whether the administrator's incentives make treating it as an unbiased fiduciary

18

counterintuitive." Id. (citing Pinto, 214 F.3d at 388).  The court emphasized that this is a "broad-based inquiry into whether the structure of the plan raises concerns about the administrator's financial incentive to deny coverage improperly," and that courts should not get "bogged down" in applying the factors cited above.  Id.

Two aspects of some plans' financial structure raise particular concern: (1) when a plan is funded on a case-by-case basis, Skretvedt v. E.I. DuPont & De Nemours Co., 268 F.3d 167, 174 (3d Cir. 2001), and (2) when it is funded and administered by an outside insurer, Pinto, 214 F.3d at 390.  Case-by-case funding simply means that the administrator pays claims out of its operating budget, rather than from segregated monies that the employer sets aside according to an actuarial formula.  Post, 501 F.3d at 163.  This raises concerns because it means that each dollar paid out is a dollar out of the administrator's pocket, see Stratton, 363 F.3d at 254, and, thus, the administrator has a financial incentive to deny claims.  Post, 501 F.3d at 163.

"This concern is compounded when it is an outside insurer, rather than the employer, that funds and administers the plan," because it is fair to "presume that employers have at least some self-interest in seeing that benefits are paid fairly."  Id.  However, when an outside insurer funds the plan, the employer is a step removed from the process, making it less likely to feel the full effects of employee dissatisfaction with claims handling.  Id. at 163-64 (citing Pinto, 214 F.3d at 389).  In addition, as the Supreme Court recently recognized in Met. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008), the conflict that arises when a plan administrator both funds and administers a benefit plan is precisely the sort of conflict that the Supreme Court had in mind in Firestone when it counseled courts to weigh conflicts of interest as a factor in determining whether the administrator abused its discretion.

19

The structure alone can require heightened review.  Post, 501 F.3d at 164; Pinto, 214 F.3d at 390.  In Pinto, the plan administrator was an outside insurance company that received an actuarial premium from the employer, so what the insurer/administrator paid out came directly off its bottom line.  Post, 501 F.3d at 164 (citing Pinto, 214 F.3d at 390).  The Pinto court noted that this structure creates a high level of financial conflict of interest because the insurer/administrator has a strong incentive to construe claims in a light most favorable to it.  Id. (citing Pinto, 214 F.3d at 389).  However, a structural conflict of interest that is mitigated by "independent claim evaluation and no evidence of procedural bias," should only heighten the court's review slightly.  Id. (citing Stratton, 363 F.3d at 254-56).  Indeed, when structural factors are present, but procedural bias is absent, the level of review should not be raised above moderate scrutiny.  See id. (citing Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000).

2.      *Procedural Factors*

Next, the court must consider the administrator's behavior during the decision-making process to determine whether there is evidence of bias.  Pinto, 214 F.3d at 393.  The Court of Appeals for the Third Circuit provided the following "illustrative, not exhaustive, list" of the types of "procedural irregularities" that can raise suspicion:  (1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability.  Post, 501 F.3d at 164-65.

In considering procedural factors, the pertinent focus is whether "the administrator has

given the court reason to doubt its fiduciary neutrality." Id. at 165.  If so, then the district court

must decide how much to heighten its scrutiny.  Id.   If the irregularities are minor, few in

number, and not sustained, then the court should not raise its level of scrutiny much at all.  Id.

On the other hand, if the procedural irregularities are "more serious, numerous, or regular, then

they should raise more suspicion," because in the fiduciary context, "marked deviations from

procedural norms cannot but raise questions about its neutrality."  Id.; see Kosiba v. Merck &

Co., 384 F.3d 58, 66 (3d Cir. 2004); Pinto, 214 F.3d at 393.

 If there is significant evidence of procedural bias, courts must review the administrator's

decision closely.  Post, 501 F.3d at 165; Pinto, 214 F.3d at 394.  "Evidence that an

administrator's  decision was incorrect, coupled with evidence it was biased, can add up to a

conclusion that its decision was not the product of reasoned discretion, but of anti-claimant bias,

in which case the decision should be reversed."  Post, 501 F.3d at 165 (citing Pinto, 214 F.3d at

395).  On the other hand, if there is only non-trivial evidence of procedural bias, the standard of

review should be raised, but "the more difficult question is how much."  Id.  In Kosiba, the court

of appeals discerned non-trivial evidence of procedural bias, but which it found to be neither

egregious nor coupled with evidence of structural bias.  Accordingly, the court heightened its

scrutiny only a moderate amount.  Kosiba, 384 F.3d at 68.  In Pinto, on the other hand, the court

of appeals found that evidence of  procedural bias was coupled with evidence of structural bias,

and so it heightened its review substantially.  Pinto, 214 F.3d at 394.

 Essentially, the application of the sliding scale method "reduces to making a common-

sense decision based on the evidence whether the administrator appropriately exercised its

discretion.  This theme, rather than getting bogged down in trying to find the perfect point on the

sliding scale, should be district courts' touchstone."  Post, 501 F.3d at 162.

**DISCUSSION**

I.      THE DE NOVO STANDARD OF REVIEW APPLIES TO THIS CASE

      **A.      The Policy Does Not Vest "Discretionary Authority" With Prudential**

As noted above, in this case the Policy at issue states that a "Total Disability exists when Prudential determines" that certain conditions are met.  (R. at PRU 000012) (emphasis added).  Prudential argues that this language is sufficient to confer complete discretion upon Prudential with regard to determining whether the conditions of a "Total Disability" are met and, accordingly, that the Court should apply an arbitrary and capricious standard.

The Third Circuit Court of Appeals has not addressed whether the precise language in this Prudential insurance policy (i.e., "when Prudential determines") is sufficient, under Firestone, to confer discretion upon Prudential and thereby change the standard of review from de novo to "arbitrary and capricious."  The results from other circuits are somewhat mixed, although the only courts of appeals to have issued precedential opinions addressing this standard of review issue have ruled that the de novo standard is the correct one to employ.

In particular, the courts of appeals for the Second, Fourth and Seventh Circuits have issued precedential opinions holding that the "when Prudential determines" language is insufficient to confer discretion upon Prudential, and have applied (or have remanded the case to the district court to apply) the de novo standard.  See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 109 (2d Cir. 2005) (holding that "when Prudential determines" does not vest discretion in Prudential); Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 322 (4th Cir. 2008) ("Although the Plan's language vests authority in Prudential, it does not create any discretionary

authority, as required by <u>Firestone</u>.");[14] <u>Diaz v. Prudential Ins. Co. of Am.</u>, 424 F.3d 635, 639-40

(7th Cir. 2005) (reversing district court and remanding in order to apply the <u>de</u> <u>novo</u> standard in

reviewing plaintiff's claims).[15]  In contrast, the Sixth and Eleventh Circuit Courts of Appeals

have issued unpublished opinions affirming application of arbitrary and capricious review in

cases involving the "when Prudential determines" language.  <u>See</u> <u>Noland v. Prudential Ins. Co. of</u>

<u>Am.</u>, 187 Fed. App'x 447, 452 (6th Cir. 2006) (non-precedential); <u>Keith v. Prudential Ins. Co. of</u>

<u>Am.</u>, 256 Fed. App'x 347 (11th Cir. 2007).  However, neither of these cases reflect an in-depth

analysis of the phrase "when Prudential determines" in light of <u>Firestone</u>.

In <u>Woods</u>, the most recent precedential appellate opinion on this issue, the Court of

Appeals for the Fourth Circuit drew a distinction between a policy that merely vests authority in

a plan administrator to make determinations regarding a claimant's eligibility under the policy,

and a policy that vests discretion in addition to authority.  <u>Woods</u>, 528 F.3d at 323-24.  The court

---

[14] Previously, in an unpublished opinion, the Court of Appeals for the Fourth Circuit affirmed the district court's application of a modified abuse of discretion standard when addressing identical language in the Prudential policy at issue in <u>Woods</u> and at issue here.  <u>See</u> <u>Formica v. Prudential Ins. Co. of Am.</u>, 162 Fed. App'x 250, 251 (4th Cir. 2006) (non-precedential).  However, in <u>Formica</u>, the claimant conceded that the phrase "when Prudential determines" conferred discretion upon Prudential, so the appellate court did not have the opportunity to determine the application of <u>Firestone</u> to the Prudential language at issue.

[15] In <u>Nichols</u>, the Court of Appeals for the Second Circuit found that the language gave "Prudential the power to make the determination, but the list of specific conditions requires that such power be exercised only in accordance with objective standards." 406 F.3d at 109.  In finding that this language did not vest discretion upon Prudential, the court declined to "read in language, effectively amending the provision to find disability 'when Prudential determines to its satisfaction that all these conditions are met.'"  <u>Id.</u>  Similarly, in <u>Diaz</u>, the Court of Appeals for the Seventh Circuit concluded that the critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or whether it has the latitude to shape the application, interpretation, and content of the rules in each case.  424 F.3d at 639-40.  The <u>Diaz</u> court found that the Prudential language at issue fell into the former category.  <u>Id.</u>

noted that

> [A]lmost all ERISA plans designate an administrator who, in order to carry out its duties under the plan, must determine whether a participant is eligible for benefits. Yet this authority to make determinations does not carry with it the requisite discretion under <u>Firestone</u> unless the plan so provides. <u>Firestone</u> itself is based on this distinction. That decision, grounded in common law trust principles, drew a contrast between trustees who had no discretion but who, of course, had authority to manage a trust, and trustees who had been granted discretion, in addition to their authority. This distinction is important because ERISA plans are to be construed "in accordance with the reasonable expectations of the insured" when ambiguous, and are to "enable plan beneficiaries to learn their rights and obligations at any time" by "reliance on the face of written plan documents." A plan which simply conveys authority to an administrator creates the expectation only that such authority will be exercised, not that the administrator will enjoy wide discretion in wielding its authority as well as freedom from searching judicial scrutiny.

<u>Id.</u> at 323 (internal citations omitted). The <u>Woods</u> court stated that the phrase "when Prudential determines" "merely designates who must make benefit determinations and the timing of those determinations," but does not imply the extension of discretion upon Prudential. <u>Id.</u> Thus, the court held that a policy must clearly and specifically confer <u>discretion</u> in order to warrant application of the abuse of discretion standard, and that this requirement fulfilled the intent of ERISA and the reasoning underlying <u>Firestone</u>. By contrast, acceptance of Prudential's argument would "lead to an abuse-of-discretion review in nearly every ERISA benefits case, thereby jettisoning <u>Firestone</u>'s distinction between authority and discretionary authority," "because an administrator always possesses such authority (the responsibility to make eligibility determinations being inherent in the office of administrator)." <u>Id.</u> at 323-24.

Several district courts within the Third Circuit have addressed claims under Prudential policies that included the "when Prudential determines" language at issue here, and indeed have uniformly applied the arbitrary and capricious standard. However, in all of those cases the

presiding court did not have occasion to determine whether the phrase "when Prudential determines" conferred discretion upon Prudential either because the parties in those cases agreed that the policy vested Prudential with discretion or because other factors were at play.  See Kuhn v. Prudential Ins. Co. of Am., 551 F. Supp. 2d 413, 425 (E.D. Pa. 2008) (applying abuse of discretion standard after noting that the "parties do not dispute that the [Prudential] Policy gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the Plan"); Harrison v. Prudential Ins. Co. of Am., 543 F. Supp. 2d 411, 421 (E.D. Pa. 2008) (finding that the Prudential plan at issue "confers on Prudential the 'sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits,'" citing an un-referenced document in the administrative record);[16] Mazaheri v. Prudential Ins. Co. of Am., No. 06-0309, 2007 U.S. Dist. LEXIS 93024, at *22-23 (E.D. Pa. Dec. 17, 2007) (denying Prudential's motion for summary judgment after applying heightened arbitrary and capricious standard without squarely addressing Prudential's discretion); Digiacomo v. Prudential Ins. Co. of Am., 501 F. Supp. 2d 626, 632 n.10 (D.N.J. 2007) (applying heightened arbitrary and capricious standard after both parties acknowledged that this standard

---

[16] Although the Harrison court's opinion did not specify where the quoted language derived from, the identical language was cited in Woods as having appeared in the "Summary Plan Description" of the Prudential policy at issue.  The Woods court noted that the summary contained the following language: "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious."  Woods, 528 F.3d at 322 n.3.  However, in Woods, the court noted that both Prudential and the plaintiff acknowledged that the summary language is not relevant to the court's inquiry because it was not contained in the Plan itself.  Id. The court also stated that inclusion of this language in the summary "demonstrates that Prudential knows how to draft language expressly reserving discretionary authority," although Prudential failed to do so in the plan itself.  Id.

25

applied); <u>Fletcher v. Prudential Ins. Co. of Am.</u>, No. 06-2679, 2007 U.S. Dist. LEXIS 58511, at

*10 (E.D. Pa. Aug. 9, 2007) (applying heightened arbitrary and capricious standard without

addressing whether "arbitrary and capricious" or <u>de novo</u> applied); <u>Rupert v. Prudential Ins. Co.</u>,

No. 05-1022, 2006 U.S. Dist. LEXIS 17313, at *20 (M.D. Pa. Apr. 7, 2006) (finding, without

analysis, that "when Prudential determines" provides Prudential with the discretionary authority

to determine whether the claimant is disabled); <u>Marciniak v. Prudential Fin. Ins. Co. of Am.</u>, No.

04-2156, 2005 U.S. Dist. LEXIS 18403, at *7 (E.D. Pa. Aug. 29, 2005) (finding, without

analysis, that Prudential had discretionary authority, and that an arbitrary and capricious standard

of review applies), <u>aff'd</u>, 184 Fed. App'x 266, 268 (3d Cir. 2006) (non-precedential);[17] <u>Gigante</u>

<u>v. Prudential Ins. Co. of Am.</u>, No. 04-0780, 2005 U.S. Dist. LEXIS 36568, at *10 (E.D. Pa. Mar.

22, 2005) (finding, without analysis, that "[u]nder the plan, Prudential has sole discretion to

determine eligibility for long term disability benefits"); <u>Mitchell v. Prudential Health Care Plan</u>,

No. 01-331, 2002 U.S. Dist. LEXIS 10567, at *22 (D. Del. June 10, 2002) (finding discretion,

and noting that the usual meaning of the word "determines" implies the exercise of discretion,

that a determination is reached only after deliberation of some sort, and that the ability to think or

deliberate prior to making a decision is the touchstone of discretion).[18]

---

[17] In <u>Marciniak v. Prudential Fin. Ins. Co. of Am.</u>, 184 Fed. App'x 266 (3d Cir. 2006), the court of appeals affirmed the district court's application of the arbitrary and capricious standard. However, it appears that the appellant did not challenge the district court's <u>use</u> of the arbitrary and capricious standard (as opposed to reviewing the case <u>de novo</u>), but rather, challenged the district court's application of the proper level of scrutiny under the sliding scale approach. <u>Id.</u> at 267.

[18] Prudential cites to <u>Lazun v. Prudential Ins. Co. of N. Am.</u>, No. 05-0764, 2007 U.S. Dist. LEXIS 11528 (E.D. Pa. Feb. 16, 2007), in support of its argument that the arbitrary and capricious standard should apply.  In that case, the claimant/plaintiff argued that the employer served as the plan administrator, but conceded that Prudential had discretion to construe the plan

Following guidance from the Woods, Nichols and Diaz courts – all courts of appeal addressing head-on the very language at issue here – the Court finds that the phrase "when Prudential determines," the only language in the entire Policy referenced by Prudential on this issue, is insufficient to confer unambiguously discretion upon Prudential.  In Firestone, the Supreme Court set the de novo standard as the default standard, mandating its application unless the plan in question vests discretionary authority in the plan administrator to make benefits determinations.  Firestone, 489 U.S. at 115.  Setting the de novo standard as the default makes sense because application of an "abuse of discretion" standard requires that the party making the determination had "discretion" to begin with.

"Discretionary authority" is not conferred by the mere fact that a plan requires a determination of eligibility or entitlement by the plan administrator.  Woods, 528 F.3d at 322.  Although courts have held that a plan need not use the precise terms "discretion" or "deference," the terms of the plan must clearly set forth a subjective standard in order to warrant arbitrary and capricious review.  Nichols, 406 F.3d at 108.  In other words, language that merely sets forth an objective standard that an administrator must follow does not reserve discretion to the administrator.  Id.  The Prudential Policy at issue here merely sets forth objective criteria and

_____

and decide the claimant's eligibility for benefits.  The court rejected the plaintiff's argument that, because the employer did not have discretionary authority to determine his benefits, and because the employer is the plan administrator, the denial of benefits should be reviewed under the de novo standard.  The court examined the definition of "plan administrator" and "fiduciary" under ERISA, and found that Prudential was a fiduciary.  Because Prudential was a fiduciary, and because the parties appeared to concede that Prudential had discretion, the court found that Prudential's denial of Plaintiff's claim for long-term disability benefits must be reviewed under the arbitrary and capricious standard.
    Contrary to Prudential's statement in its brief here, however, nowhere in the published opinion does the Lazun court address whether the language "when Prudential determines" conferred discretion upon Prudential to determine "when Total Disability exists" under the plan.

standards that Prudential must act in accordance with in making benefits determinations.  The Policy does not clearly, expressly or even impliedly, reserve discretion for Prudential to define when "Total Disability" exists according to its subjective qualifications.  Therefore, the Court will apply the <u>de novo</u> standard of review.

**B.    Application of the <u>De Novo</u> Standard to this Case**

The Court finds that Prudential incorrectly terminated Ms. Elms's LTD benefits.  Stated simply, the administrative record indicates that Ms. Elms has suffered from similar, if not identical, symptoms since she was injured in the January 2001 auto accident, and that those symptoms render her "disabled."  Every doctor to have offered an opinion on Ms. Elms's condition has found that her movements and ability to perform the most basic tasks are impaired.  In light of the evidence before Prudential when it rendered a determination as to Ms. Elms, Prudential's determination was unreasonable.

The Policy language at issue here bears repeating and provides that:

"Total Disability" exists when Prudential determines that all of these conditions are met:

1.    Due to Sickness or accidental injury, both of these are true:
   (a)    You are not able to perform, for wage or profit the material and substantial duties of your occupation.
   (b)    After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training, or experience.

2.    You are not working at any job for wage or profit.

3.    You are under the regular care of a Doctor.

(R. at PRU 000012.)  It is without question that items 2 and 3 of this definition have been met in

this case, as Ms. Elms has not worked since 2001 and is under the regular care of numerous

doctors.  Overwhelming evidence in the administrative record here also indicates that Ms. Elms

is "not able to perform, for wage or profit the material and substantial duties of [her]

occupation."[19]

Prudential awarded Ms. Elms LTD benefits from April 2002 to February 2005, a fact

which is especially pertinent here.  When Prudential first determined that Ms. Elms fit the

requirements of "Total Disability" under the Policy, its decision was largely based on Dr.

Beken's diagnosis of RSD, and his determination that she was "disabled" and was not capable of

returning to work.  The question which necessarily arises is:  Did Ms. Elms's condition change at

some point between April 2002 and February 2005 such that Prudential's subsequent

determination to terminate Ms. Elms's LTD benefits was reasonable?  Based upon the record

presented, the answer is no.

The first chiropractors and doctors to examine Ms. Elms after the 2001 auto accident

diagnosed her with various injuries to her back and neck, and referred her to a neurologist for

treatment of potential nerve damage.  Ms. Elms's neurologist, Dr. Beken, whom she has seen

regularly since late 2001, diagnosed her with brachial plexus injury, lower extremity nerve

damage, and RSD.  In June 2001, Dr. Beken advised Ms. Elms to cease working immediately,

and has <u>never</u> recommended that she return to work.  Indeed, as late as February 2005, Dr. Beken

---

[19] In this case, Prudential only determined whether Ms. Elms was capable of performing her own occupation, and did <u>not</u> consider whether she is/was "able to perform for wage or profit the material and substantial duties of any job for which [she is] reasonably fitted by [her] education, training, or experience," under subparagraph 1(b) of the definition of "Total Disability."  Thus, the Court's decision is restricted to deciding whether the evidence supported a determination that Ms. Elms was able perform to her own occupation.

opined that Ms. Elms was not fit for even "sedentary" or "light" work, noting that she was incapable of sitting, standing or walking for long periods of time.  (R. at PRU 000173.)

Prudential argues that Dr. Beken does not mention RSD in his later reports, which means that Dr. Beken has shied away from this diagnosis and that therefore Ms. Elms must have improved.  The record and common sense, however, fail to support Prudential's reasoning.  First, Prudential's position suffers from a fundamental gap in logic.  The absence of any mention of RSD in later records does not necessarily mean that Ms. Elms no longer suffered from RSD. Nowhere in her medical records records do any of Ms. Elms's doctors note that her RSD has resolved itself.

Second, although he did not use the magic words "RSD" or "Reflex Sympathetic Dystrophy Syndrome," Dr. Beken did describe Ms. Elms's condition as "Causalgia" in his February 2005 Attending Physician's Statement, even citing the appropriate International Classification of Diseases (ICD-9) code for Causalgia of the lower limb (355.71).[20]  (R. at PRU 000171.)  As the Court understands the relationship between RSD and Causalgia, Causalgia is a more advanced and more severe form of RSD that is diagnosed when the patient's pain can be traced to a nerve injury.  Since Dr. Beken's more recent documentation cites a diagnosis of Causalgia while his earlier records referred to RSD, Prudential's contention that Ms. Elms's

─────────────

[20] Indeed, Dr. Beken's mention of Causalgia in his February 16, 2005 Attending Physician's Statement (R. at PRU 000171-73), coupled with his failure to mention Causalgia in a February 16, 2005 office visit summary (R. at PRU 000094), demonstrates the gap in Prudential's logic.  Clearly, Dr. Beken's failure to mention the disorder in his office notes did not mean that he no longer believed Ms. Elms had that disorder.  It logically merely meant that his office notes did not include a comprehensive continuing reiteration of all of Ms. Elms's disorders.

30

condition has "improved" is based on a fundamental misunderstanding of these conditions.[21]

Prudential's June 27, 2005 and July 26, 2006 decisions terminating and upholding the termination of Ms. Elms's LTD benefits completely ignore Dr. Beken's Causalgia diagnosis. The Court is left to conclude that Prudential did not see Dr. Beken's Causalgia diagnosis (which is hard to believe since the word appears twice in documents completed by Dr. Beken in early 2005 and submitted to Prudential by Ms. Elms for its consideration), that Prudential saw but did not understand Dr. Beken's diagnosis, or that Prudential failed to acknowledge this diagnosis.[22]

_____

[21] The Court notes that neither party in this case discussed the symptoms or the nature of RSD or Causalgia in any detail.  Yet the fate of Ms. Elms's LTD benefits appears to depend on Prudential's understanding (or misunderstanding) of these conditions.  Throughout their motion papers, and during oral arguments, Prudential clung to the notion that Ms. Elms merely suffers from lumbar injuries, while discounting RSD and Causalgia symptoms, such as extreme pain, a symptom which appears throughout Ms. Elms's medical records both explicitly and implicitly through the many mentions of Ms. Elms' pain medications.

Indeed, Prudential acknowledges Ms. Elms's reports of pain time and again and discounts them as subjective and not supportive of disability.  (See R. at PRU 000144.)  In cases involving fibromyalgia, courts have held that plan administrators improperly required objective medical evidence to prove a claim based on fibromyalgia, a condition based on subjective complaints of pain.  Steele v. Boeing Co., 225 Fed. Appx. 71, 74-75 (3d Cir. 2007) (non-precedential);  Kuhn, 551 F. Supp. 2d at 428.  One cannot help but note the similarities between this case, involving the subjectively-diagnosed disorders RSD and Causalgia, and the fibromyalgia cases.  The Court hesitates to take the comparison too far without more evidence of the medical similarities and differences between the disorders, but notes, however, that plan administrators must be wary of denying claims because of a lack of objective evidence when the disabling condition on which the claimant rests her case rests heavily on subjective evidence.

[22] During oral arguments on the parties' cross motions for summary judgment, in response to a question from the Court as to how Prudential interpreted Dr. Beken's "Causalgia" diagnosis, Prudential's counsel stated that she did not recall the term "Causalgia" being in Ms. Elms's records.  (Hr'g Tr. 10:8-23, Mar. 7, 2008.)  She also stated that she did not see this diagnosis in Dr. Beken's notes.  (Hr'g Tr. 14:1-5.)

When the Court asked whether Prudential considered this diagnosis, raised any criticisms, or questioned Dr. Beken about this diagnosis, which appeared in an Attending Physician's Statement but not in Dr. Beken's sparse office notes, counsel stated "I don't believe that [causalgia] was specifically addressed in any of the administrative record that I can point to saying that a Prudential agent looked at and asked what causalgia indicates."  (Hr'g Tr. 15:20-

All three of these possibilities are unacceptable as a proper discharge of Prudential's responsibilities.

Moreover, Prudential completely ignored the fact that Dr. Beken's opinions of Ms. Elms's limitations and impairments did not change significantly from 2001 to 2005. Throughout the period documented in the administrative record, Dr. Beken noted severe limitations, including Ms. Elms's inability to drive or use a computer (R. at PRU 000334), inability to sit still (R. at PRU 000245), inability to raise her left arm (R. at PRU 000245), and inability to pick up heavy objects, or sit, stand, or walk for any sustained period of time (R. at PRU 000173). These limitations are in addition to Ms. Elms's consistent complaints of severe pain, documented as ranging from 3/10 to 10/10, and general discomfort, which Prudential discounts completely.

During oral arguments, Prudential's counsel stated that "plaintiff's doctors never state that she's disabled from her occupation." (Hr'g Tr. 14:24-25.) This statement is at best disingenuous. While it may be true that Dr. Beken did not say, in those exact words, that Ms. Elms is "disabled from her occupation," in his February 2005 statement, he opined that she was not capable of even "sedentary" or "light" work. He stated that her prognosis for returning to work was 10-20%, and that she was incapable of sitting, standing, or walking for long periods of time, and unable to lift, pull, push or carry anything sizeable. (R. at PRU 000173.) In his office notes of February 16, 2005, Dr. Beken notes that Ms. Elms "will be off of work and she will not lift, pull, push or carry to prevent damages." (R. at PRU 000094.)

It is important to note that no doctor who has actually treated Ms. Elms or examined her in person, as opposed to performing a "file review," has found her to be capable of returning to

---

23.)

work or performing her work-related tasks.  Even Dr. Jares, the neurologist who performed the most recent "file review" of Ms. Elms's claim, found that Ms. Elms is functionally impaired, that she has numerous restrictions on her physical abilities, and that her prognosis is merely fair.  (R. at PRU 000085.)  Only Prudential and Prudential's own medical director have found Ms. Elms capable of returning to work.  As noted above, her treating physician, Dr. Beken, has stated that she is incapable of working on numerous occasions.  In addition, Dr. Gaul, a neurologist who examined Ms. Elms at Prudential's request, also found that, while Ms. Elms may be physically "capable of at most what would generally be considered sedentary work," "the degree of pain and spasm that she suffers does currently preclude her from any job."[23]  (R. at PRU 000204) (emphasis added).  Moreover, Dr. Gaul stated that Ms. Elms may be capable of performing her job if his regimen of therapy was successful, and even then, it would take three to six months of aggressive treatment before she was capable of returning to work.  Id.  As noted above, Dr. Beken strongly disagreed with Dr. Gaul's course of treatment because he felt it would aggravate her RSD.

   Prudential previously found that Ms. Elms was entitled to LTD benefits on the basis of Drs. Beken's and Gaul's evaluations, as it awarded her benefits in October 2002 and again in February 2003, after those doctors evaluated her.  Prudential's about-face, therefore, is puzzling. Part of Prudential's determination to terminate benefits in February 2005 was understandable, in light of Ms. Elms's refusal to submit documentation of her continuing disability upon

_____

[23] Prudential characterizes Dr. Gaul's conclusions as stating that Ms. Elms "is physically capable of her sedentary job."  However, this is not what Dr. Gaul concluded.  As stated above, Dr. Gaul unequivocally stated that Ms. Elms's pain and spasm "currently preclude her from any job," and that "at most" she is capable of "sedentary work, with postural freedom."  (R. at PRU 000204) (emphasis added).

Prudential's request.  However, once Ms. Elms appealed and submitted documentation and records from Dr. Beken, with whom Prudential was familiar because it based its previous decisions to award Ms. Elms LTD benefits largely on his opinions, Prudential's determination to uphold its termination of LTD is unfounded.

Even without the evidence of Prudential's curious reversal, this Court still fails to see any logic underlying Prudential's denial of benefits.  Although Ms. Elms's job as a Human Resource Assistant is predominantly "sedentary," like many office-centric jobs, it is a gross over-simplification to conclude on that basis, and seemingly that basis alone, that Ms. Elms is capable of performing her prior job.  Given all of the different tasks that Ms. Elms was responsible for performing at Diebold, which are documented in the administrative record here, it is not reasonable to assume, as Prudential does, that Ms. Elms's position was sedentary to the extent that if she can sit, she can work.  She was responsible for interfacing with managers daily, coordinating various services, training new associates, backing up all secretarial functions, and performing administrative duties such as filing.  Prudential ignores Ms. Elms's contentions, which are supported by the record, that she was required to move around the office quite frequently, if not constantly; that she was required to give presentations which required her to stand for long periods of time; and that she was required to travel occasionally, i.e., up to six times per year.  There is substantial evidence in the record that Prudential knew that Ms. Elms was required to travel an average of six times a year, occasionally driving for up to 5 hours at a time, yet Prudential fails to substantively address this aspect of her job at all in its termination letters.  While Prudential's letter upholding its decision to terminate Ms. Elms's benefits accurately refers to these travel requirements, there is no indication that Prudential actually

34

considered these requirements in light of Ms. Elms's limitations, nor is there any indication as to how Prudential expected Ms. Elms to cope with her travel obligations.

Moreover, Prudential's report offers no discussion or analysis of what effect certain limitations or restrictions would have on Ms. Elms's job activities even if she were able to remain "sedentary" most of the day.  Dr. Jares, the neurologist who reviewed Ms. Elms's file when she appealed Prudential's June 2005 denial of her appeal, opined that "performing repetitive and fine motor activities would be restricted to an occasional basis."  (R. at PRU 000085) (emphasis added).  Prudential does not assess whether typing or word processing and other computer activity would qualify as "repetitive and fine motor activities," and, as such, whether Ms. Elms would be limited to performing these tasks on "an occasional basis."  Dr. Jares also noted that Ms. Elms's reach would be limited to 18 inches and that she would only be able to reach occasionally.  (R. at PRU 000085.)  Ms. Elms's job is not simply to be seated, but to perform certain tasks like word processing on a computer and reaching to answer a telephone while she is seated.  If she requires frequent repositioning and is in constant pain while she is seated, can only type and perform other computer-related tasks "occasionally," and has a restricted range of motion while she is sitting, one wonders just what aspects of her "sedentary" job Ms. Elms will be able to perform.  Prudential does not provide an answer to that question.

For the reasons discussed above, reviewing this matter de novo, the Court finds that the evidence in the administrative record does not support Prudential's determination to terminate Ms. Elms's LTD benefits.  Instead, the evidence supports a finding that Ms. Elms suffers from a "Total Disability" under the Policy, and that she is entitled to LTD benefits dating back to February 18, 2005.  Accordingly, Ms. Elms's motion for summary judgment will be granted and

Prudential's motion will be denied.

## II.    ALTERNATIVELY, PRUDENTIAL ABUSED ITS DISCRETION IN THIS CASE

In an abundance of caution, however, the Court will review the parties' cross-motions

under a heightened abuse of discretion standard as well.  This analysis yields the same practical

result.

As an initial matter, the Court notes that Ms. Elms urges the Court to consider certain

evidence outside the administrative record, which she submitted along with her motion for

summary judgment, as evidence of Prudential's alleged "bad faith."  However, because the extra-

record materials submitted by Ms. Elms are either inappropriate or simply not probative of any

issues being determined, the Court will confine its review to the administrative record at hand. [24]

---

[24] Generally, only evidence in the administrative record is admissible for the purpose of
determining whether the plan administrator's decision was arbitrary and capricious.  See Post,
501 F.3d at 168; Kosiba, 384 F.3d at 67 n.5; Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440
(3d Cir. 1997); Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 48 n.8 (3d Cir. 1993).
However, the court of appeals has permitted a district court to consider extrinsic evidence when
deciding how much to heighten its review.  Post, 501 F.3d at 168; Kosiba, 384 F.3d at 67 n.5.
That evidence must show "potential biases and conflicts."  Kosiba, 384 F.3d at 67 n.5.

In this case, the Court permitted the parties to conduct limited discovery relating to the
issue of Prudential's potential conflict of interest.  Ms. Elms now submits certain additional
evidence intended to supplement the record.  In particular, she submitted a letter of confirmation
of employment (intended to show that she was actually hired as a Human Resources Assistant)
(Pl. Mot. Summ. J. Ex. C), her own executed affidavit prepared for the Court's determination of
the cross motions for summary judgment  (Pl. Mot. Summ. J. Ex. D), excerpts from the
deposition of Philip Miraldo, the Prudential claims analyst who decided Ms. Elms' most recent
appeal  (Pl. Mot. Summ. J. Ex. G), an email from defense counsel to plaintiff's counsel related to
the calculation of the amount of Ms. Elms's benefits  (Pl. Mot. Summ. J. Ex. HH), and a paystub
from Ms. Elms's former employer (Pl. Mot. Summ. J. Ex. II).

The Court permitted discovery regarding how Prudential calculated benefits, but that
issue is separate from (and secondary to) the dispositive issues in this case.   Evidence to
supplement the record is only permitted to show bias or prejudice, and none of what Ms. Elms
submitted is probative of that issue with the exception of Mr. Miraldo's deposition.  However,
even that evidence is of minimal import.  With respect to the issue of whether Ms. Elms was a
Human Resources Assistant and not a Senior Secretary, in its responsive statements of fact

A.      Determining the Appropriate Standard Along the "Sliding Scale"

Assuming, as Prudential argues, that the Policy in question vests Prudential with discretion to determine eligibility for benefits under the terms of the Plan, then the "arbitrary and capricious" standard applies.  The Court, then, must first identify the structural and procedural factors, if any, and determine how they figure in to the application of that standard.

In that regard, Prudential argues that this case warrants only a low to moderately heightened arbitrary and capricious review.  Prudential concedes that some structural factors favor heightened review because Prudential is more sophisticated than Ms. Elms and is an outside insurer engaged in funding and administering the Plan.  However, Prudential argues that no procedural bias is present in this case, and that absent procedural bias, only a moderate heightening of the standard of review is appropriate.

Ms. Elms agrees that heightened scrutiny is warranted because Prudential both administered and funded the plan, but in addition, she argues that the administrative record in this case is "rife with demonstrated conflict of interest, procedural irregularities, bias and unfairness in the review of [Ms. Elms's] claim."  (Pl. Mem. Supp. 11.)  Ms. Elms claims that "there were various procedural irregularities that tend to suggest that Prudential's decisions

---

Prudential admitted that she was a Human Resources Assistant.  Thus, the employment confirmation letter is not necessary to an issue in dispute.  Finally, Ms. Elms's affidavit is entirely inappropriate.  In it she describes her job responsibilities and salary.  However, her assertions are not relevant to the issue of bias.  Instead, the potential relevance of Ms. Elms's assertions bears on the issue of whether Prudential reached the right decision in finding that she could perform her job responsibilities.  However, because this evidence was not submitted to Prudential and made part of the record, it cannot be considered for that purpose.  Post, 501 F.3d at 168-69.  Therefore, because all of the extra-record evidence submitted by Ms. Elms is either inappropriate or irrelevant, the Court will restrict its review to the administrative record submitted by Prudential in this case.

unfavorable to Plaintiff were improper and that the reasons proffered for those decisions were pretextual." (Pl. Mem. Supp. 11.)  Accordingly, Ms. Elms argues that the level of the Court's review should exceed a "moderate heightening."  For the reasons discussed below, the Court concludes that there are enough structural and procedural irregularities present here to warrant a level of review tilting towards the moderate-to-high end of the sliding scale.

>    1.    *Structural Factors*

Our Court of Appeals' holdings in Pinto and Post make clear that structural factors alone can require heightened scrutiny.  See Post, 501 F.3d at 164; Pinto, 214 F.3d at 390 (noting that a non-trivial structural conflict gives rise to heightened scrutiny, i.e., it pushes the standard of review above the low end of the sliding scale).  Several structural factors are present here that warrant heightening the Court's review.[25]  First and foremost, Prudential both administers and funds the benefit plan.  Pinto declared this type of conflict to be "substantial and worthy of raising the standard of review."  Pinto, 214 F.3d at 393; see also Glenn, 128 S. Ct. at 2349-50 (holding that both administering and funding an ERISA plan creates a conflict).  In addition, there is no "independent claim evaluation," Prudential is the more sophisticated party, and Ms. Elms is a former employee.[26]  Accordingly, under guidance from Post and Pinto, the Court's review is heightened moderately.  While the Court may not substitute its judgment for that of Prudential, if the review of the record establishes that Prudential failed to adequately support its

---

[25] Accessibility of information is another factor to consider in determining to what extent the Court should heighten its review.  In this case, it is unclear whether this factor is an issue.

[26] As the court of appeals noted in Post, as a former (as opposed to a current) employee, it is unlikely that Ms. Elms's "dissatisfaction with the claims-handling process will filter back to [her employer] and translate into pressure on [Prudential] to deal more precisely with claims."  Post, 501 F.3d at 165.

decision, the Court may find that Prudential did not properly exercise its discretion.  <u>Post</u>, 501 F.3d at 164.

           2.     *Procedural Factors*

The next issue is whether procedural factors counsel in favor of further increasing the Court's degree of review.  Ms. Elms's arguments on this point are not entirely clear.  In her brief, she states, without providing examples, that the administrative record is "rife" with evidence of conflicts of interest, bias, and procedural irregularities.  However, her "procedural bias" arguments are blended with her arguments on the merits, namely, that Prudential's decision is not supported by the evidence, such that it is unclear what Ms. Elms considers to be the procedural irregularities in this case.  After reviewing the administrative record in this case, the Court finds that there are procedural irregularities present that warrant tipping the sliding scale of review in Ms. Elms's favor.

In <u>Post</u>, the Court of Appeals identified a number of factors which may demonstrate procedural bias, namely (1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability.  <u>Post</u>, 501 F.3d at 164-65.  This list was not meant to be exhaustive, but merely a starting point for courts in their analysis of possible procedural bias.  <u>Id.</u>

The second factor cited by the <u>Post</u> court applies here.  Prudential's initial "file review" illustrates its insistence on selectively using and interpreting physician's reports.  Prudential based its June 2005 decision to uphold its termination of Ms. Elms's benefits largely on a "file

review" conducted by its own medical director, Dr. Fallon.[27]  In spite of the consensus of the

doctors who examined Ms. Elms in person that she faced significant limitations, Dr. Fallon

concluded that Ms. Elms's limitations and restrictions were lifting up to 10 pounds and refraining

from overhead activity and repetitive pulling or pushing.  (R. at PRU 000359.)  In rendering this

conclusion, Dr. Fallon disregarded Dr. Gaul's 2003 IME, in which Dr. Gaul concluded that Ms.

Elms's pain and spasm "preclude her from any job," and Dr. Beken's 2005 Attending Physician's

Statement, in which Dr. Beken notes that Ms. Elms cannot sit, stand or walk for long periods of

time.  Instead, inexplicably, Dr. Fallon focused on Ms. Elms's limitations in lifting, pushing and

pulling, and as a result, Prudential upheld its termination decision.  Likewise, as noted in the

Court's de novo analysis, Dr. Fallon, like all of the Prudential reviewers, ignored Dr. Beken's

diagnosis of Causalgia.  In summarizing Dr. Beken's Attending Physician's Statement, Dr.

Fallon lists only lumbar strain and lumbar plexus as Ms. Elms's ailments.  Id.

     Moreover, the only evidence in the record of Dr. Fallon's "evaluation," is a half-page

"note" in Prudential's internal files.  (See R. at PRU 000359.)  There is no documentation of

which medical records, if any, Dr. Fallon reviewed, which doctors' opinions, if any, she

considered, and no indication of what factors she considered or weighed in rendering her

opinion.  Her "conclusion" consists of a one-line list of the restrictions noted above.  This lack of

care or thoroughness in fully considering Ms. Elms's claim also suggests procedural bias,

particularly because Prudential's February 2005 denial of Ms. Elms's claim was based primarily

on Ms. Elms's failure to provide additional documentation and not on affirmative evidence of

---

[27] There is no mention in the record of Dr. Fallon's medical specialty, and certainly no
suggestion that she is a neurologist or that she is familiar with nerve disorders or pain syndromes,
including RSD, CRPS, of Causalgia.

improvement to her medical condition.  When given a chance to actually consider the merits of her claim rather than deny it on a technicality, Prudential relied on Dr. Fallon's half-page "note," which is hardly a thorough review of the record.

When Ms. Elms appealed Prudential's June 2005 decision and submitted documentation from Drs. Beken and Robinson, Prudential took the advisable step of seeking an opinion from a neurologist, Dr. Jeres, instead of relying solely on its own medical director.  However, Prudential further demonstrated its selectivity in using and interpreting physicians' reports when it considered Dr. Jeres' review.  Dr. Jeres was asked to review and comment on Ms. Elms's medical records and job descriptions, and to answer the questions presented to him by Prudential.  Dr. Jeres presented his conclusions in the form of answers to five specific questions that had been posed by Prudential.[28]

In response to these questions, Dr. Jeres opined that the medical documentation he

---

[28] These questions are as follows:

1.  Based on the documentation reviewed, does Ms. Elms have functional impairment(s) from February 18, 2005 forward?  If so, please list the functional impairment(s) and the evidence supporting your opinion.

2.  Please identify the appropriate restrictions and/or limitations in terms of Ms. Elms's ability to sit, stand, walk, lift, reach, carry, grip, grasp, pinch, and perform repetitive and fine motor hand activities, based on the functional impairment(s) you have listed.  Please also note the duration of any applicable restrictions and/or limitations (e.g. temporary or permanent) and the evidence supporting your opinion.

3.  If medical records are indicating significant impairment, please comment on expected treatment, duration and prognosis.

4.  If you opine that Ms. Elms is not functionally impaired, please provide a detailed explanation supporting your opinion.

5.  Do the medical records support significant adverse side effects (including cognitive deficit) from any medication or combination of medication(s)?  If so, please specify which medication(s) and for what time period.

(R. at PRU 000079-86.)

reviewed supports the conclusion that Ms. Elms remained functionally impaired as of February 18, 2005, forward.  (R. at PRU 000084.)  He also noted certain limitations, including Ms. Elms's inability to sit without repositioning once an hour, her inability to walk or stand more than two hours total during the day and not for longer than 20-30 minutes at a time, her inability to reach more than 18 inches (and only on an occasional basis), and her inability to perform repetitive and fine motor activities on more than an occasional basis.  (R. at PRU 000085.)  Notably, however, Dr. Jeres was not directly asked whether, in his view, Ms. Elms was capable of performing her job responsibilities, and he did not offer an opinion as to that precise question.

On July 26, 2006, Prudential again affirmed its own decision terminating Ms. Elms's LTD benefits.  (R. at PRU 000064-69.)  Prudential's letter quoted Dr. Jeres's conclusions nearly verbatim, offering no additional analysis whatsoever.  As noted above in the Court's de novo analysis, Prudential failed to consider how the many restrictions delineated by Dr. Jares could be reconciled with Ms. Elms's job description.  Prudential does not assess whether typing or word processing and other computer activity would qualify as "repetitive and fine motor activities," and, as such, whether Ms. Elms would be limited in performing these tasks.  Again, her job is not simply to remain seated, but to perform certain tasks such as word processing while she is seated. It is a virtually inescapable conclusion that Prudential was self-serving in its selection of what to consider and what to ignore in the record, this time neglecting to consider how Dr. Jares's conclusions regarding Ms. Elms's restrictions would affect Ms. Elms's ability to perform her job.

Notably, Prudential's two most recent decisions denying Ms. Elms's appeal relied almost exclusively on file reviews performed by physicians who had never personally examined Ms. Elms, in the face of consistent evidence from other doctors' reports that she faced significant

limitations.  Certainly, ERISA does not require Prudential, as the Plan administrator, to give the opinions and diagnoses of a treating physician special weight.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 823-24 (2003); Post, 501 F.3d at 166.   However, ignoring a treating physician's opinions for no apparent reason, in favor of the opinion of a file reviewer, is a much different story.  Here, Prudential not only ignored Ms. Elms's treating physicians's opinions, but also the opinion of its own independent medical examiner, Dr. Gaul, who opined that Ms. Elms was incapable of performing even sedentary work.

Prudential also repeatedly failed to correctly identify Ms. Elms as a Human Resources Assistant.  Prudential's denial of benefits is based entirely on its conclusion that Ms. Elms is physically capable of performing her "own occupation," yet Prudential's report identifies Ms. Elms as a Senior Secretary, and analyzes her limitations with respect the duties of a Senior Secretary.  The difference in the two positions may be minimal, but there is something to be said of Prudential's failure to get this starting point right.  In addition, Prudential describes Ms. Elms's position as "sedentary."  Prudential ignores Ms. Elms's contentions that she was required to move around the office quite frequently, if not constantly, that she was required to give presentations which required her to stand for long periods of time, and that she was required to travel occasionally.  As recounted above, there is substantial evidence in the record that Prudential knew that Ms. Elms was required to travel an average of six times a year, occasionally driving for up to 5 hours at a time, yet Prudential fails to address this aspect of her occupation in its termination letters.  Prudential accurately refers to Ms. Elms's travel requirements in its letter upholding its decision to terminate benefits, but there is no indication that Prudential actually considered these requirements in light of Ms. Elms's limitations.  Likewise, once again,

Prudential does not explain how it expected Ms. Elms to cope with her travel obligations.[29]

Ms. Elms also notes that Prudential denied payment of LTD benefits to Ms. Elms despite a favorable Social Security decision in her favor,[30] and argues that this denial is evidence of

_____

[29] From a "procedural" standpoint, it does seem clear that Prudential put considerable effort into determining the extent of Ms. Elms's travel obligations at work.  There are several internal notes and formal correspondence between Prudential and Ms. Elms's former employer indicating that Prudential attempted to ascertain the extent of her travel obligations.  For example, in its May 6, 2005 internal notes Prudential noted that Ms. Elms "traveled occasionally for benefit orientation" and had to "stand and walk due to movement throughout the office (mailroom, other associates, and testing).  Prudential noted that it would "clarify" her traveling requirements.  (R. at PRU 000361.)  On June 7, 2005, Prudential noted that Ms. Elms "on average was required to travel 6 times per year.  Mainly for the new hire orientations."  (R. at PRU 000362.)  On June 5, 2006, Prudential again noted that it needed to clarify Ms. Elms's travel requirements, e.g., by car, plane, to what cities, and how far the location was from her primary office.  (R. at PRU 000368.)  On July 21, 2006, Prudential received an email from Ms. Elms's employer noting that Ms. Elms was responsible for "occasional travel to train other administrators.  Perhaps once a quarter to points within the Eastern Division no more than 5 hours drive."  (R. at PRU 000392.)

Prudential's diligence and persistence in acquiring this information should be commended.  However, the extent to which Prudential went to acquire this information makes it all the more confusing as to why it failed to adequately address Ms. Elms's travel obligations when it rendered the conclusion that Ms. Elms could perform her "sedentary" occupation.

[30] In Post, our court of appeals noted that it had not passed on the relevance of Social Security decisions in determining the appropriate standard of review, but other courts of appeals and some district courts have held that a disagreement with the Social Security Administration is a "relevant – though not dispositive – factor."  See Post, 501 F.3d at 167 (citing Glenn v. MetLife, Inc., 461 F.3d 660, 669 (6th Cir. 2006) ("[A]n ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was 'totally disabled' is yet another factor that can render the denial of further long-term disability benefits arbitrary and capricious."); Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 6 n.9 (1st Cir. 2003) ("It is well settled that a Social Security disability benefits decision is relevant evidence but 'should not be given controlling weight except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan.'") (citation omitted); Whatley v. CNA Ins. Co., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (per curiam) (noting that approval of disability benefits by the SSA is not dispositive but may be considered by the district court in reviewing a plan administrator's determination of benefits ); Edgerton v. CNA Ins. Co., 215 F. Supp. 2d 541, 549 (E.D. Pa. 2002) (noting that an SSA decision is not dispositive in determining whether an ERISA administrator's decision is arbitrary and capricious, but is a factor that should be considered);

Prudential's "bad faith." On this point, the Court disagrees. In this case, the only evidence in the record relating to Ms. Elms's Social Security benefits is the letter from the SSA informing her that she is entitled to Social Security benefits. (R. at PRU 000249.) The letter appears to be SSA's standard "form" that does little more than notify the claimant that he or she is entitled to benefits. For purposes of this case, the letter from the SSA at best has marginal import because it does not state the basis for the SSA's decision to award disability benefits to Ms. Elms. Because this letter is the only evidence in the record relating to the SSA's decision, and because it has no probative value, the Court will not assume that Prudential denied Ms. Elms's claims "in spite of" an SSA decision in her favor. While it appears that Prudential was unaware of the basis for the SSA's decision and chose not to pursue finding out why Ms. Elms was awarded disability benefits, it is not the case that Prudential simply disregarded material information supporting the SSA's decision – Ms. Elms simply did not provide any such information to Prudential for its consideration.[31]

All of these procedural factors add up to enough evidence of irregularity and bias to warrant the heightening of the sliding scale even further. Combined with the structural factors noted above, the procedural factors lead this Court to apply a moderate-to-high level of scrutiny.

---

Dorsey v. Provident Life & Accident Ins. Co., 167 F. Supp. 2d 846, 856 n.11 (E.D. Pa. 2001) (same). In Post, the court of appeals agreed that a disagreement with the Social Security Administration is relevant though not dispositive, particularly when the administrator rejects the very diagnoses on which the Social Security benefits determination is based. Post, 501 F.3d at 167.

[31] If, for example, there was evidence in the record that SSA found that Ms. Elms was entitled to benefits due to her RSD, and Prudential knew of, but ignored that finding, Ms. Elms's procedural irregularity argument might have more merit.

**B.      Application of the Heightened "Arbitrary and Capricious" Standard to this Case**

Applying moderate-to-high scrutiny (i.e., weighing the structural and procedural factors, as well as the facts in the record), the Court finds that Prudential failed to adequately support its decision, and, therefore, did not properly exercise its discretion.  Post, 501 F.3d at 164.  The Court is mindful that the pertinent question under this standard is not whether Prudential has presented sufficient evidence that Ms. Elms is <u>not</u> disabled, but is whether Ms. Elms presented sufficient evidence of her disability to Prudential such that its decision terminating her LTD benefits could be deemed to be "arbitrary and capricious."

Many of the same factors discussed above in the Court's <u>de novo</u> apply here and need not be repeated in detail.  First and foremost, the Court must again ask "what changed?"  As discussed above, the answer to that question is "nothing."  All of the medical evidence in the record shows that the doctors who examined Ms. Elms in person and addressed the question of Ms. Elms's disability and/or limitations found Ms. Elms to be severely restricted in her abilities, such that she was not capable of performing even sedentary work.  Even one of Prudential's file reviewers, Dr. Jares, found Ms. Elms to be significantly restricted.[32]

Indeed, one of Prudential's central reasons for denying Ms. Elms's appeals, namely, that she no longer suffered from RSD, is directly contradicted in the record by Dr. Beken's diagnosis of Causalgia, a diagnosis which Prudential either overlooked or ignored completely.  Moreover, whether Ms. Elms has RSD or not, her well-documented limitations weigh substantially in favor of a finding of "Total Disability."  Using "common sense" to make a "decision based on the

_____

[32] Because Dr. Jares was never directly asked whether those restrictions prevented Ms. Elms from performing her occupation, however, his opinion on this critical issue is unclear.

evidence whether the administrator appropriately exercised its discretion," this Court concludes that the abundant evidence in favor of Ms. Elms's disability, coupled with the structural and procedural factors discussed above, show that Prudential did not appropriately exercise its discretion.

**CONCLUSION**

For the reasons discussed above, applying the <u>de novo</u> standard of review, the Court concludes that Prudential's decision upholding its termination of Ms. Elms's long-term disability benefits was not based on sufficient evidence. Instead, the evidence indicates that Ms. Elms satisfied all of the requirements of a "Total Disability" as defined under the Policy administered by Prudential. In addition, the Court finds that Prudential's decision was unreasonable under a "moderate-to-high" arbitrary and capricious standard. Therefore, Ms. Elms's motion for summary judgment will be granted, and Prudential's motion for summary judgment will be denied.

An Order consistent with this Memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONNA M. ELMS,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **PRUDENTIAL INSURANCE** | : | |
| **COMPANY OF AMERICA,** | : | |
| Defendant | : | **No. 06-5127** |

**O R D E R**

**AND NOW**, this 2nd day of October, 2008, upon consideration of cross motions for summary judgment filed by Prudential Insurance Company of America (Docket No. 11), and Donna M. Elms (Docket No. 12), and the parties' respective responses (Docket Nos. 15-16), **IT IS ORDERED** that:

1.   Donna M. Elms's Motion for Summary Judgment (Docket No. 12) is **GRANTED**.

2.   Prudential Insurance Company of America's Motion for Summary Judgment (Docket No. 11) is **DENIED**.

3.   Within 10 days of the entry of this Order, the parties shall submit a joint form of judgment that provides for past benefits in a stated amount (including a deduction for any overpayment of benefits through February 17, 2005) and future benefits at stated rates.  In the event of disagreement concerning the judgment, the parties shall submit supporting memoranda to allow the Court to make a proper determination.  If any party believes an evidentiary hearing on the issue of computation of benefits is necessary, that party shall so notify the Court within one calendar week of the date of this Order.

48

BY THE COURT:


_____    S/Gene E.K. Pratter
                           GENE E.K. PRATTER
                           United States District Judge